UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JEFFREY CHURCH,<br><br>      Plaintiff,<br><br>vs.<br><br>STACE NELSON, Senator of the 19th District of the South Dakota Senate, individual and official capacity,<br><br>      Defendant. | Civ. 19 - 4193<br><br>**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF AND DECLARATORY RELIEF** |

## **INTRODUCTION**

  Defendant Stace Nelson has opposed the Motion for Preliminary Injunction by filing a 3-page brief and an affidavit from Nelson. Neither submission diminishes the force of arguments in favor of Mr. Church's application for injunctive and declaratory relief. The briefing fails to acknowledge multiple cases that apply directly to the facts here and the one case it invokes – *Morgan v. Bevin,* 298 F. Supp. 3d 1003 (E. D. Ky. 2018) – is an outlier that has been repeatedly rejected in subsequent decisions. The Affidavit attempts to walk a tightrope by explaining what Nelson did, while denying culpability for his actions and leaving only a vague idea of when and why those actions were taken. This attempt falls flat, as even Nelson's self-serving narrative shows that (a) he took exception to Church's comments in a thread on his Facebook page; (b) he took action that removed those comments and restricted Church's access; and (c) he did so with an aim of suppressing Church's speech and denying him the ability to engage in further expressive activity.

1

Nelson also makes a half-hearted attempt to sidestep the merits of the dispute by suggesting that the controversy is moot because (a) Nelson no longer serves as a publicly official; and (b) Nelson took his Facebook account offline in "December 2019." As this Court previously held, Church's causes of action are not mooted by Nelson's retirement from public office. Likewise, the particular claims for injunctive and declaratory relief present a live, justiciable controversy that is ripe for adjudication.

## ARGUMENT

**A. Under the prevailing legal standards that govern social media activities of public officials, Nelson's Facebook account constitutes a public forum and his retaliatory conduct in restricting Church based on Church's expressive activity within that forum violates the First Amendment.**

Nelson's responsive brief relies solely on *Morgan v. Bevin,* 298 F. Supp. 3d 1003 (E. D. Ky. 2018), without explaining the factual context underlying the decision or informing the Court that its rationale has been repeatedly rejected by subsequent decisions. In *Bevin,* the Eastern District of Kentucky concluded that social media accounts of the Governor of Kentucky did not constitute a public forum, but were instead government speech. It held that all of the activity on the Governor's social media accounts – including responses and statements from third parties such as the plaintiffs – were government speech and therefore were not subject to the public forum analysis. 298 F. Supp. 3d at 1010-1011.

The counterintuitive analysis set out in *Bevin* has not found favor in subsequent cases. Mr. Nelson does not say a word about countervailing authority cited by Mr. Church, including *Knight First Amendment Institute at Columbia University v. Trump,* 928 F. 3d 226 (2d Cir. 2019) and *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019).[1] Indeed, Nelson fails to

---

[1] In *Davison,* the Fourth Circuit, U.S. Court of Appeals, upheld the district court's conclusion that a chair of county board of supervisors engaged in viewpoint discrimination in

acknowledge that several decisions not only declined to follow *Bevin,* but expressly note the incongruity behind its central premise, i.e., that comments made by citizens in response to a public official's Facebook or Twitter post somehow constituted government speech. "[W]hile the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation." *Knight,* 928 F.3d at 239. *See also Faison v. Jones,* 440 F. Supp. 3d 1123, 1137 (E.D. Cal. 2020) ("But *Bevin* is unpersuasive because the court there merged the government and private speech analysis and found that a Governor's Facebook page and Twitter account were privately-owned based on reasoning that is at odds with the more recent Second and Fourth Circuit decisions.").

Nelson's myopic analysis also ignores other decisions from around the country that have established a prevailing consensus that a public official who treats his or her Facebook page as an interactive space to engage citizens and address issues and policies relating to his or her office has created a public forum to which First Amendment protections apply. *See, e.g, Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *25 (S.D. Cal. Sept. 26, 2019) (finding that the interactive portion of the defendants' Facebook pages were public forums because the defendants "were posting content related to their positions as public officials and had opened the pages to the public without limitation when they blocked Garnier" and

---

violation of the First Amendment by banning county resident from posting on webpage and affirmed the declaratory judgment entered by the District Court. 912 F.3d at 687-688, 691. In *Knight,* the Second Circuit, U.S. Court of Appeals, upheld the grant of summary judgment in Plaintiffs' favor, concluding that the Twitter account of President Trump constituted a public forum and held that "[b]y blocking the Individual Plaintiffs and preventing them from viewing, retweeting, replying to, and liking his tweets, the President excluded the Individual Plaintiffs from a public forum, something the First Amendment prohibits." *Knight,* 928 F.3d at 238.

denying Defendants' Motion for Summary Judgment after concluding that disputed issues of material fact existed as to basis for decision to "block" Defendant from the Facebook page); *Campbell v. Reisch*, 367 F. Supp. 3d 987 (W.D. Mo. 2019) (holding that public forum doctrine applied to state representative's social media account, that facts alleged in Complaint were sufficient to establish that Defendant was acting under color of state law, and denying Defendant's Motion to Dismiss).

Nothing in Mr. Nelson's opposition papers mounts a serious challenge to his status as a "state actor" or the evidence showing a close nexus between his status as a state official and the use to which he put the Facebook account. Indeed, because Nelson's Facebook page served as a public forum, his conduct in administering that page constitutes conduct under color of state law. Even if that were not the case, the exhibits attached to Church's Declaration demonstrate that Mr. Nelson acted as a state actor in his use of Facebook social media generally and in the specific factual context that gives rise to Mr. Church's claims.[2] The record evidence (including statements in Nelson's affidavit) makes clear that the Facebook page was used to communicate with constituents, to attempt to reach potential voters, to run ads, to share his political views, to provide updates on legislative activity, and to post polls that were intended to elicit the views of others on matters of public concern.

---

[2] As previously noted, Mr. Nelson's Facebook page made specific reference to his status as an elected official. The caption of the page reads "South Dakota Senator Stace Nelson" and depicts the state seal of South Dakota. (Church Declaration, Ex. A). The page features a picture of Mr. Nelson, his name, and then the handle @SenatorStaceNelson. It also has included videos referring to his status as an elected official and an endorsement he has received from South Dakota political action committee. (Wilka Declaration, Ex. A).

B. **The evidence in record establishes that Nelson took action to prevent Church from accessing, viewing, and continuing to participate in the public forum Nelson created in order to suppress Church's speech and silence his viewpoint.**

Nelson seeks to lay the blame on Facebook itself, suggesting that he did not "ban" Church but only unfriended and blocked him, which – according to Nelson – automatically restricted Church's access to the comment thread in the Poll. *Id.* at ¶14. Nelson then equivocates, suggesting that he did "not recall the precise actions with Church" but did recall reporting Church to Facebook, then unfriending and blocking Church from what Nelson calls his "personal business profile account." *Id.* at ¶15. He does not provide any detail about information he allegedly provided to Facebook, nor does he indicate that he ever received any response from Facebook.

Although *Bevin* is of dubious precedential value, it does help lay out the interplay between a personal user account and a "Page" affiliated with a business or elected official, as summarized here:

> Facebook's terms of service indicate that users should have only one personal account, but businesses and elected officials may also make Pages. A Page is similar to a user profile, with a few exceptions; it can have more than one administrator and has some additional rules and functionality. Also, a Page is public, unlike an individual user profile. Pages have certain built-in moderation capabilities that can automatically block as spam comments containing user-identified words. Comments that contain words meant to be filtered out are placed in a spam folder and later can be manually published by a Page's administrator. Additionally, a Page administrator can set up a profanity filter through Facebook at an off, moderate, or strong setting. Page administrators also can manually hide comments that they do not want to be displayed on a Page. If a comment is hidden, the original commenter can see their comment, the moderator can see their comment, the original commenter's friends can sometimes see the comment, but no one else on the Page can. A Page administrator can delete a comment or post; when a comment or post is deleted, it's gone completely and there is no record of its existence. A Page administrator can also report comments to Facebook, who can delete the comment or post if they find it does not abide by their guidelines. Facebook notifies the individual who has been reported if their post or comment is deleted and may suspend their account if they find the conduct egregious. Individuals can also report entire user accounts.

> Page administrators can block individuals from their Page, which prevents "them from interacting with the [P]age moving forward. They can still see the [P]age, they can still view it, [ ] they ... can't comment;" but they can share posts on their own timeline. When a user shares a post from a Page, they can add their own comment to the post, which will display on their own account. Page administrators can also disable private messages being sent to the Page.

*Bevin,* 298 F. Supp. 3d at 1007.

The "public office" Facebook Page that Nelson used to post the poll and engage in other state action was owned and operated "under and through his personal business Facebook profile account 'Stacey Nelson (Stace Nelson).'" Nelson Affidavit, at ¶6. In Facebook's nomenclature, this account is a Page that relates directly to Nelson's status as a public official.

In the screenshots provided to the Court, messages from Nelson's Page appear as "Stace Nelson" and have a blue checkmark. Messages from his personal account appear as "Stacey Nelson" and do not have a blue checkmark. The screenshots previously produced as part of Church's submission demonstrate that Nelson has posted comments on the Page from both accounts. Even if the Court accepts Nelson's self-serving narrative at face value, the actions that Nelson describes in his affidavit – unfriending Church and blocking him from continuing to participate in the comment threads on the Page that followed the Article V poll – had the same functional effect as blocking Church from the public forum (the Page) and denying him the right to engage in ***any*** subsequent expressive activity. *See* Nelson Affidavit, ¶¶14-15.

A comparison of Exhibit G and Exhibit H demonstrates Nelson's erasure of Church's statements and shows clear evidence of viewpoint discrimination. Exhibit H consists of two posts from Nelson. The first post, appearing at the top, consists of four paragraphs and begins: "Jeff Church you supported financially and campaigned for someone who is recognized as a far Left liberal Democrat." It then continues with a series of insults and defamatory statements.

Exhibit G reads as a response to the first post on Exhibit H. It consists of at least five paragraphs (the final paragraph is cut off) and begins by linking to "Stace Nelson" (the hyperlink associated with Nelson's Page) then begins, "Hi Stacey. Good to hear from you again. Of course I campaigned "heavily" for your opponent for the Senate seat, you are a terrible representative for your District and our State because you have a terrible record of accomplishing anything other than bluster and bullying." Church's post continues, setting forth his views about Nelson's record and then returning to the topic of the Article V Convention of the States. *See* Exhibit G.

The post in Exhibit G is responsive to Nelson's first post shown in Exhibit H. The second post from Nelson in Exhibit H is a response to Church's critical post shown in Exhibit G. But what is missing? The interceding post from Church that was critical of Nelson's record as a legislator. Why is it missing? Based on Nelson's affidavit, his actions in unfriending and blocking Church appear to have removed at least some of Church's comments. Moreover, because of Nelson's actions, Church could no longer participate in the thread going forward.

In his Affidavit, Nelson avers that he took this action in light of "disparaging comments" that Church made in responding to the poll, without identifying specifically the comments at issue. *Id.* Context makes clear that he is referring to Church's statements in the post that is set out in Exhibit G. Church's views on Nelson's performance as a legislator may have been critical, but his statements were responsive to Nelson's statements (first post, Exhibit H) and continued to address the subject matter of the thread.

This overview provides good reason to view Nelson's narrative with a healthy dose of skepticism. There is no record that Facebook ever took action in response to Nelson's alleged

7

report.  Church's comments about Nelson's record as a legislator are no more inflammatory and derisive than Nelson's personal attacks and defamatory statements about Church.

This much at least is clear:  Nelson took exception to comments made by Church in response to the Poll and in response to Nelson's taunts.  Nelson then engaged in personal, venomous attacks, calling Church a "coward and a liar."  Ex. H.  Nelson even gave forewarning of the action he eventually took.  *See* Wilka Declaration, Ex. C, at 3 [bottom of the page] ("Jeff Church slanderous comments and lies will be deleted.  Either mind your manners or go someplace else to post your propaganda.").  Nelson acted to suppress Church's speech by changing Church's status and access to Nelson's Facebook account, which removed at least some of his comments from the thread on the Page.  After Nelson took this action, a Facebook user who viewed Nelson's Page would encounter Nelson's side of the exchange, but not comments from Church.

The context of the exchange confirms that Nelson's actions in "blocking" Church arose because of and in response to the content of Church's statements.  Nelson's parting shot – in which, among other things, he defamed Church through puerile name-calling – demonstrates that he singled Church out based on his viewpoint.

Church's criticism of Nelson's actions as a public official and his statements regarding the Article V Convention of States both embody political speech, which is "the core of the protection afforded by the First Amendment."  *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995); *Davison,* 912 F.3d at 688 (citing and quoting *McIntyre* and noting that targeting comments critical of an officeholder's official actions and fitness for office are especially problematic instances of viewpoint discrimination); *see also Robinson v. Hunt Cty., Texas*, 921

F.3d 440, 447 (5th Cir. 2019) (finding that a government official's act of banning a constituent from an official government social media page was unconstitutional viewpoint discrimination).

These conclusions are reinforced by Nelson's own affidavit. Before Church engaged in that expressive activity, Nelson alleges that Church had "unfettered access and ability to interact with [Nelson]" on his personal Facebook page and what Nelson inaccurately describes as his "campaign" page. Nelson Affidavit, ¶15. That unfettered access continued until Church engaged in expressive activity with which Nelson disagreed, at which point Nelson, exercising control over the Facebook pages, retaliated against Church by effectively blocking him. Thereafter, Church could not interact with Nelson or other citizens who had joined the conversation and could no longer respond to Nelson's continued efforts to smear him. In sum, Nelson all but concedes that he engaged in viewpoint discrimination against Church.

What's more, Nelson and other legislators were specifically advised about the risk of deleting, banning, or blocking users from social media accounts affiliated with their office. This directive was provided by the South Dakota Legislative Research Council in a June 2019 Newsletter. *See* Hagen Declaration, Exhibit I.

The South Dakota Legislature established the Legislative Research Council ("LRC") in 1951 in order "to provide full-time staff to the legislature." [3] The newsletter is described as "an informational publication of the Legislative Research Council for members of the South Dakota Legislature." Hagen Declaration, Exhibit I, at 1. The June 2019 newsletter includes a section entitled "Noteworthy Nuggets," with a specific topic addressing "Social Media/ Public Forums."

---

[3] *See* https://sdsos.gov/general-information/about-state-south-dakota/summary-south-dakota-state-government/legislative-branch.aspx (last visited Aug. 3, 2020).

*Id.* That section includes the following advice to legislators regarding their use of social media accounts:

> Several legislators use social media as a means of communicating with constituents and informing them about issues under discussion throughout the state. **No matter the platform of social media used, legislators should remember that, as public officials, their social media is generally considered to be a type of public forum in which the public may exercise their freedom of speech.**
>
> **Viewpoint discrimination is strictly forbidden on a legislator's social media. This means, as a general matter, even if a member of the public posts something that is blatantly false or mean-spirited, the post must not be deleted, and the member of the public must not be blocked. The legislator's only recourse is to respond to the post with an opposing argument.**
>
> This general rule has exceptions. Although a member of the public enjoys First Amendment protection to post any matter of opinion or fact on an legislator's social media, this protection does not extend to certain forms of speech: obscenity or pornography, incitements to violence or illegal activity, threats of physical harm, words that induce public safety concerns, or words that disclose privileged or confidential information. In these instances, the posts may be deleted; however, before any post is deleted, the legislator should take a screen shot of the post to keep a record of the content being deleted.
>
> If a person repeatedly posts content that is subject to being deleted, this behavior could be considered harassment, warranting the person being blocked. Before taking this extreme step, the legislator should consult with legal counsel to ensure the behavior warrants the person being blocked, and to guard against any legal ramifications that could result.

*Id.* at 3 (emphasis supplied). The LRC's statement regarding social media is unequivocal in advising Nelson and other legislators that social media accounts such as Nelson's Facebook accounts are generally considered to be public fora; that a post to a legislator's social media account "must not be deleted," even if it is "blatantly false or mean-spirited"; and that the user who contributed the post "must not be blocked." *Id.*

Though this LRC statement acknowledges that certain exceptions may exist, the conclusory statements in Nelson's affidavit about Church's post demonstrate that even Nelson did not consider these exceptions applicable. Nelson described the comments that prompted him

10

to block Church as "disparaging and disrespectful." Nelson Affidavit, ¶¶14-15. Such statements do not rise to the level of speech that is covered under the enumerated exceptions, as Nelson's own characterization confirms.

Further, in the First Amendment context, the words that constitute expressive activity are not assessed according to the subjective standard of an individual listener, but to an objective standard that assesses what they mean to a reasonable person. *See, e.g., Fisher v. Wal-Mart Stores, Inc.,* 619 F.3d 811, 820 (8th Cir. 2010) (whether statement is reasonably capable of defamatory meaning is a question of law). Church's expressive activity is not reasonably susceptible to an interpretation that would classify any statement he made as "obscenity or pornography, incitements to violence or illegal activity, threats of physical harm, words that induce public safety concerns, or words that disclose privileged or confidential information." Thus, none of the exceptions set out in the LRC policy statement apply, and Nelson does not even allege to the contrary.

The wealth of authority discussed above shows that Nelson's Page constitutes a public forum. But even if the status of Nelson's Facebook account and Page were an open question, the facts demonstrate that Nelson acted against Church because of the content of Church's speech. That constitutes viewpoint discrimination, which is impermissible, regardless of the forum in which it occurs. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469–70 (2009) (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806 (1985) (viewpoint discrimination prohibited in nonpublic forums). *Accord Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1001 n.1 (8th Cir. 2012).

### C. Church is entitled to injunctive relief and to a declaring judgment holding that Nelson's conduct violated Church's First Amendment rights.

Injunctive relief is appropriate and necessary when a public official engages in viewpoint discrimination. Likewise, entry of a declaratory judgment holding that such viewpoint discrimination is unconstitutional is also warranted. In the social media context, both forms of relief are justified when a public official bans users from posting on that public official's Facebook page or deleted the users' comments because the public official disagrees with the viewpoint expressed by the user. *See Faison,* 440 F. Supp. 3d at 1139 (granting preliminary injunction to restore Facebook users' ability to access Sheriff's Facebook page and to restrict Sheriff from restricting further participation); *Davison,* 912 F.3d at (affirming declaratory judgment in favor of plaintiff concluding that public official engaged in unconstitutional viewpoint discrimination when she banned Plaintiff from Facebook Page that constituted public forum).

In *Faison*, the District Court held that the Facebook page of the Defendant Sheriff, a public official, constituted a public forum and that the Sheriff engaged in viewpoint discrimination in violation of the First Amendment by banning users who were critical of the Sheriff and deleting their critical comments. 440 F. Supp. 3d at 1133. The District Court granted preliminary injunctive relief by ordering that Defendant unban Plaintiffs from his Facebook page, retain them in unbanned status, and take no further action restricting their participation unless and until further order of this Court. The same analysis applies to the facts at issue here, and the same result is warranted under the relevant *Dataphase* framework.

Under the prevailing consensus set out in cases previously discussed, Nelson's Facebook Page constitutes a public forum. Moreover, the clear evidence of Nelson's viewpoint

12

discrimination demonstrates that Church has a high likelihood of prevailing on the merits, even if Nelson's Facebook accounts do not constitute a public forum.

Under the law of this Circuit, a showing of likelihood of success on the merits is "likely enough, standing alone, to establish irreparably harm." *Lowry ex rel. Crow, v. Watson Chapel Sch. Dist.,* 540 F.3d 752, 762 (8th Cir. 2008). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) ("The harm is particularly irreparable where... a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'") (ellipses in original, citing and quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008)).

The remaining *Dataphase* factors also weigh strongly in Church's favor. The balance-of-the-harms factor calls for consideration of harms that "would result in the following scenarios: (1) if the court improperly denied the preliminary injunction; and (2) if the court improperly granted the preliminary injunction." *B.K. ex rel. Kroupa v. 4-H*, 877 F. Supp. 2d 804, 822 (D.S.D. 2012), *aff'd sub nom. Kroupa v. Nielsen*, 731 F.3d 813 (8th Cir. 2013). Here, Nelson would suffer no harm if enjoined from re-publishing his Facebook pages in their present form, i.e., by continuing to suppress Church's speech and restrict him from participating. By contrast, if the injunction is denied and Nelson re-activates his account, Church would be denied access to a public forum in which he sought to participate and the violation of his First Amendment rights would continue unabated.

The public interest is served when the protections in the United States Constitution are rigorously enforced. *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994,

1004 (8th Cir. 2019) ("[T]he public is served by the preservation of constitutional rights."). Without citation or supporting evidence, Nelson maintains that issuance of an injunction would "cause a corresponding chilling effect potentially on any and all other former elected officials in unlawfully upon and substantially harming their rights to free speech and freedom of association in personal social media forums." This statement is a non sequitur. An injunction could have no discernible effect on Nelson's speech, nor would it "chill" speech from other office-holders or candidates for public office. To the contrary, the public interest would be advanced by a ruling that further clarifies the respective rights and obligations of candidates, office-holders, and citizens when communicating about matters of public concern on social media.

### D. Defendant's half-hearted "mootness" claim is contrary to law, fact, and logic.

Mr. Nelson's Affidavit describes how he took both Facebook accounts at issue in this case off-line in "December 2019." Record evidence shows that this happened after December 2, 2019, (*see* Wilka Declaration and Ex. C thereof), and likely happened after the lawsuit commenced on December 3, 2019. *See* Complaint. This raises concern about the potential spoliation of the electronically stored information, which Nelson's Affidavit does not dispel.

Nelson appears to imply that because he is no longer in office and because the Facebook accounts are no longer active, he can somehow escape being held to account for the unlawful misconduct that prompted the lawsuit in the first place. Both assertions are meritless.

That Nelson is no longer a public official has no effect on the irreparable harm that his conduct has caused and continues to cause. Mr. Church's speech remains deleted. The subject matter of the poll continues to be a live subject of discussion and debate among South Dakota citizens, including those who participated in the discussion that Nelson initiated. Moreover, taking the prior discussion offline – and the evidence of Nelson's viewpoint discrimination with

14

it – does not impact the viability of Church's challenge to the underlying conduct. *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (holding that a moratorium on the use of choke holds by the police department did not moot a case challenging the constitutionality of the use of choke holds because "[i]ntervening events have not irrevocably eradicated the effects of the alleged violation").

Nelson's decision to de-activate his Facebook Page and personal account does not render the case moot. "Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power." *Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944). Here, Nelson cannot even claim to have voluntarily discontinued his violation of Mr. Church's First Amendment rights; rather, he simply took action that would remove evidence of that violation from public view. Further discovery is necessary to determine whether his conduct compromised the underlying electronically stored information, so as to subject him to spoliation. But there is no basis to suggest that Nelson has cured the underlying violation by, for example, taking action to restore Church's comments so they were no longer hidden. Even that action would not moot the case. In *Knight First Amendment Institute at Columbia University,* President Trump and his co-defendants "unblocked" the individual Plaintiffs from his Twitter account after the District Court found in Plaintiffs' favor. That curative action "[did] not render the case moot." 928 F.3d at 233 n.3 (citing and quoting *Walling*, 323 U.S. at 43).

There is also a basic logical flaw in Nelson's mootness claim. Ceasing service as a public official does not mean Nelson now lacks control over the Facebook pages at issue. Expiration of his term as a public office holder does not mean that Nelson is prevented in any way from activating his account today, tomorrow, or a year from now. *See, e.g., Knox v. Service Employees,* 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not

ordinarily render a case moot because a dismissal for mootness would permit resumption of the challenged conduct as soon as the case is dismissed."). Even if one were to accept Nelson's erroneous claim that the dispute was rendered moot by taking the Facebook account offline, the situation is "capable of repetition, yet evading review." *See, e.g., Missourians for Fiscal Accountability v. Klahr,* 830 F.3d 789 (8th Cir. 2016). Because Nelson retains control over the account, he retains the ability to re-activate it and may change his mind. The mootness analysis centers on "whether the controversy was *capable* of repetition and not ... whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n. 6, (1988) (emphasis in original).

Church acknowledges that, because of Nelson's actions in taking the Facebook pages offline after the lawsuit started, the scope of available injunctive relief may arguably have changed. Church does not request that the Court compel Nelson to "re-activate" the inactive Facebook pages, to the extent that such relief may compel Nelson to publish his own prior speech that may no longer reflect his views. To that end, Church believes that it would be appropriate for the Court to enter an Order enjoining Nelson from re-publishing the materials on his Facebook pages that are at issue in this case unless he simultaneously unblocks Church and takes action to assure that Church's deleted comments are fully restored to public view.

Nelson contends that there exists no live controversy because Nelson de-activated his Facebook account and Page. The decision to deactivate the Facebook account in December 2019 has no effect on whether Nelson's actions violated the First Amendment before that date. That question is live, justiciable, and properly considered now. "There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred. . . . The problem in determining whether an actual controversy is present is when a declaration is

sought on the legal consequences of some act that may or may not occur." WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2757 Existence of Actual Controversy, (4th ed.).

Furthermore, Nelson's actions in December 2019 do not render it impossible for the Court to render a declaratory judgment in Church's favor regarding Nelson's conduct in suppressing Church's speech. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. [A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox,* 567 U.S. at 307. Church and Nelson continue to have "adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Missourians for Fiscal Accountability,* 830 F.3d at 795 (citation and internal quotation marks omitted). In short, Nelson's mootness argument fails, a live and justiciable controversy exists, and Church is entitled to an adjudication on his bid for preliminary injunctive relief and declaratory relief.

## **CONCLUSION**

For the foregoing reasons, Church is entitled to (a) entry of a preliminary injunction enjoining Nelson from engaging in further conduct in violation of Church's First Amendment rights and directing that he cannot re-activate his Facebook account containing the materials at issue unless he simultaneously restores Church's expressive activity and permits him to continue to participate and access the restored Page and (b) entry of a declaratory judgment holding that Nelson has violated Church's constitutional rights under the First Amendment.

Date:  August 4, 2020.

                              CADWELL SANFORD DEIBERT & GARRY LLP

                By:   /s/ Alex M. Hagen_____
                     Alex Hagen
                     200 East 10th Street, Suite 200
                     Sioux Falls SD 57104
                     (605) 336-0828
                     *ahagen@cadlaw.com*
                     Attorneys for Plaintiff

                     *Electronically Filed*